No. 22-10161

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ROBERT HAMILTON,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California,
the Honorable William H. Orrick, Presiding.
CR No. 3:21-cr-00202-WHO-1

## DEFENDANT-APPELLANT'S OPENING BRIEF

JODI LINKER
Federal Public Defender
ANGELA CHUANG
YEVGENIY PARKMAN
Assistant Federal Public Defenders
450 Golden Gate Avenue, 19th Floor
San Francisco, California 94102
(415) 436-7700

*Counsel for Defendant-Appellant*
ROBERT HAMILTON

# TABLE OF CONTENTS

Introduction ............................................................................................. 1

Jurisdiction ............................................................................................. 2

Bail Status ............................................................................................. 2

Issues Presented ..................................................................................... 2

Statement of the Case ............................................................................ 3

    I.     Officers chased and arrested Hamilton after claiming to have a warrant for his arrest. ............................................................ 3

    II.    Hamilton was arrested because an officer suspected he was involved in a shooting weeks earlier. ................................................. 5

    III.   Hamilton was charged with possessing a gun discovered during his arrest and lost his motion alleging the arrest was illegal. ................................................................................................ 8

    IV.   Hamilton was tried for being a felon in possession of a firearm and for possessing the firearm in furtherance of marijuana distribution. ........................................................................ 9

    V.    The district court instructed Hamilton's jury about the conduct and motives of the officers who arrested him. ................. 12

    VI.   The jury convicted Hamilton only of possessing a firearm as a felon, and the court denied Hamilton's motion for a new trial. ................................................................................................ 15

    VII.   The court enhanced Hamilton's sentence for possessing a firearm in connection with marijuana distribution. ....................... 16

Summary of Argument ........................................................................ 17

Standards of Review ............................................................................ 18

Argument ............................................................................................. 19

    I.     The government failed to show that Hamilton's warrantless arrest was constitutional. ................................................................ 19

    A.  The government did not carry its burden of establishing probable cause that Hamilton committed a crime. .............. 20

    B.  The arrest was executed in an unreasonable manner. ......... 26

II.    The district court erred by instructing the jury about the police officers' conduct and motives. ................................. 31

    A.  The instruction intruded on the jury's factfinding role. ....... 32

    B.  The instruction vouched for the police officers who arrested Hamilton. ....................................................... 35

    C.  The government cannot show that the instruction was harmless beyond a reasonable doubt. .................................... 37

    D.  Hamilton preserved his objection to the instruction. .......... 40

    E.  Even if Hamilton did not preserve his objection, the instruction was plainly erroneous. ......................................... 45

III.   The district court erred in increasing Hamilton's sentence for possessing a firearm in connection with selling marijuana. ............................................................................... 46

    A.  Hamilton was not selling marijuana. .................................... 47

    B.  The gun was unrelated to any hypothetical marijuana sale. .......................................................................... 50

Conclusion ............................................................................... 52

## TABLE OF AUTHORITIES

**Federal Cases**

*Aguilar v. Woodford*,
  725 F.3d 970 (9th Cir. 2013) ................................................ 39

*Beck v. State of Ohio*,
  379 U.S. 89 (1964) ............................................................ 20

*Blankenhorn v. City of Orange*,
  485 F.3d 463 (9th Cir. 2007) ............................................. 27

*California v. Hodari D.*,
  499 U.S. 621 (1991) .......................................................... 29

*Dorn v. Burlington N. Santa Fe R.R. Co.*,
  397 F.3d 1183 (9th Cir. 2005) ........................................... 44

*Hoard v. Hartman*,
  904 F.3d 780 (9th Cir. 2018) ............................................. 42

*Jamison v. McClendon*,
  476 F. Supp. 3d 386 (S.D. Miss. 2020) ............................. 24

*Kentucky v. King*,
  563 U.S. 452 (2011) ................................................... 28, 31

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ...................................................... 50

*Murtishaw v. Woodford*,
  255 F.3d 926 (9th Cir. 2001) ............................................. 35

*Rose v. Lane*,
  910 F.2d 400 (7th Cir. 1990) ............................................. 39

*Sandstrom v. Montana*,
  442 U.S. 510 (1979) ................................................... 33, 34

*Shorter v. Baca*,
  895 F.3d 1176 (9th Cir. 2018) ........................................... 42

*Smith v. Arthur Andersen LLP,*
421 F.3d 989 (9th Cir. 2005) ............................................................ 41

*Terry v. Ohio,*
392 U.S. 1 (1968) ............................................................................. 21

*Thomas v. Chappell,*
678 F.3d 1086 (9th Cir. 2012) .......................................................... 39

*United States v. Adair,*
38 F.4th 341 (3d Cir. 2022) ............................................................. 45

*United States v. Alverez-Tejeda,*
491 F.3d 1013 (9th Cir. 2007) .......................................................... 26

*United States v. Baldon,*
956 F.3d 1115 (9th Cir. 2020) .......................................................... 51

*United States v. Bontemps,*
977 F.3d 909 (9th Cir. 2020) ............................................................ 26

*United States v. Bosse,*
898 F.2d 113 (9th Cir. 1990) ............................................................ 29

*United States v. Brown,*
925 F.3d 1150 (9th Cir. 2019) .......................................................... 24

*United States v. DeRusse,*
859 F.3d 1232 (10th Cir. 2017) ........................................................ 51

*United States v. Gaudin,*
515 U.S. 506 (1995) ......................................................................... 32

*United States v. Gonzales,*
506 F.3d 940 (9th Cir. 2007) ............................................................ 50

*United States v. Grimaldo,*
993 F.3d 1077 (9th Cir. 2021) .......................................................... 50

*United States v. Hall,*
552 F.2d 273 (9th Cir. 1977) ............................................................ 39

*United States v. Harris*,
999 F.3d 1233 (9th Cir. 2021) ............................................................ 19

*United States v. Hernandez-Meza*,
720 F.3d 760 (9th Cir. 2013) ............................................................ 42

*United States v. I.E.V.*,
705 F.3d 430 (9th Cir. 2012) ............................................................ 18

*United States v. Irons*,
31 F.4th 702 (9th Cir. 2022) ............................................. 32, 39, 45, 46

*United States v. Kaplan*,
836 F.3d 1199 (9th Cir. 2016) ............................................................ 44

*United States v. Kirilyuk*,
29 F.4th 1128 (9th Cir. 2022) ............................................................ 50

*United States v. Lampkin*,
159 F.3d 607 (D.C. Cir. 1998) ............................................................ 39

*United States v. Licavoli*,
604 F.2d 613 (9th Cir. 1979) ............................................................ 25

*United States v. Lindberg*,
39 F.4th 151 (4th Cir. 2022) ............................................................ 32, 35

*United States v. Lopez*,
482 F.3d 1067 (9th Cir. 2007) ............................................................ 20

*United States v. Mikhel*,
889 F.3d 1003 (9th Cir. 2018) ............................................. 18, 32, 33, 45

*United States v. Olano*,
507 U.S. 725 (1993) ............................................................ 40

*United States v. Perez*,
116 F.3d 840 (9th Cir. 1997) ............................................................ 40, 45

*United States v. Phillips*,
497 F.2d 1131 (9th Cir. 1974) ............................................................ 28, 29

v

*United States v. Pineda-Doval,*
   614 F.3d 1019 (9th Cir. 2010) ................................................ 40, 41, 42

*United States v. Michael Ramirez,*
   714 F.3d 1134 (9th Cir. 2013) ........................................................... 34

*United States v. Stefan Ramirez,*
   976 F.3d 946 (9th Cir. 2020) .................................................... 29, 30, 31

*United States v. Sainz,*
   933 F.3d 1080 (9th Cir. 2019) ........................................................... 43

*United States v. Smith,*
   962 F.2d 923 (9th Cir. 1992) ..................................................... 36, 37, 41

*United States v. Thongsy,*
   577 F.3d 1036 (9th Cir. 2009) ........................................................... 37

*United States v. Valencia,*
   24 F.3d 1106 (9th Cir. 1994) ............................................................. 20

*United States v. Ventresca,*
   380 U.S. 102 (1965) ......................................................................... 21

*United States v. Villagomez,*
   554 F. Supp. 3d 1019 (N.D. Cal. 2021) ............................................. 51

*United States v. Weatherspoon,*
   410 F.3d 1142 (9th Cir. 2005) ................................................ 35, 36, 38

*Wong Sun v. United States,*
   371 U.S. 471 (1963) ........................................................ 22, 23, 24, 25

*Yamada v. Nobel Biocare Holding AG,*
   825 F.3d 536 (9th Cir. 2016) ...................................................... 40, 41

**Federal Statutes**

18 U.S.C. § 922 ............................................................... 2, 8, 10

18 U.S.C. § 924 ..................................................... 2, 8, 10, 11, 15

18 U.S.C. § 3231 ..................................................................... 2

28 U.S.C. § 1291 ........................................................................... 2

**Federal Rules**

Federal Rule of Appellate Procedure 4 ................................................. 2

Federal Rule of Criminal Procedure 30 ............................................. 40

Federal Rule of Criminal Procedure 52 ............................................. 40

**United States Sentencing Guidelines**

USSG § 2K2.1 ................................................................. 17, 46, 50

**State Cases**

*Commonwealth v. Banks*,
    658 A.2d 752 (Pa. 1995) ...................................................... 25

*People v. Hall*,
    271 Cal. Rptr. 3d 793 (Cal. Ct. App. 2020) ..................................... 51

**Other Authorities**

9th Circuit Model Criminal Jury Instruction 6.9 .............................. 36

Rick Rojas & Neelam Bohra,
    *What We Know About Tyre Nichols's Lethal Encounter With Memphis*
    *Police*, New York Times (Jan. 30, 2023) ..................................... 24-25

## INTRODUCTION

Defendant-Appellant Robert Hamilton, who was acquitted of possessing a firearm in furtherance of marijuana distribution but convicted of being a felon in possession of a firearm, appeals the denial of his suppression motion; an instruction to the jury that undercut his trial defense; and the imposition of a sentence enhancement for acquitted conduct. The violations from Hamilton's arrest and trial require reversing his conviction. Alternatively, this Court should remand for resentencing.

When police officers arrested Hamilton for an unrelated offense, they found marijuana and claimed to have found a gun on him. Although the officers told Hamilton that they had an arrest warrant, they did not. As the district court held, they did not even have probable cause to arrest him. The court erred, however, when it also held that Hamilton's attempt to avoid the illegal arrest justified the officers taking him into custody.

At trial, Hamilton's defense to the felon-in-possession charge was that the officers planted the gun. The district court undermined this defense by instructing the jury that the arresting officers obtained evidence from him legally and acted without improper motives. This instruction intruded on the jury's factfinding role and vouched for the testifying officers.

Finally, the court erred at sentencing by finding that the gun was connected to marijuana sales. As the jury's verdict indicated, the marijuana was for Hamilton's personal use and had no connection to the gun.

1

## JURISDICTION

Hamilton was charged with violating two federal firearms laws (18 U.S.C. §§ 922(g)(1), 924(c)(1)(A)(i)) but convicted only under section 922(g)(1) for possessing a firearm or ammunition as a felon. 1-ER-2, 2-ER-172–173, 2-ER-349–352. The district court sentenced him on June 23, 2022, and he timely appealed five days later. 1-ER-2, 2-ER-405; *see* Fed. R. App. P. 4(b). The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291.

## BAIL STATUS

Hamilton is presently in custody on state charges. *See* https://www. sfsheriff.com/find-person-jail (SF Number 667902).

## ISSUES PRESENTED

1. Police officers may not arrest a suspect absent probable cause, and they may not develop probable cause by threatening to violate the suspect's constitutional rights or by abusing their position to mislead the suspect. Here, officers lacked probable cause that Hamilton committed a crime, but attempted to arrest him by falsely claiming that they had a warrant.

    (a) Did Hamilton create probable cause by fleeing from an illegal arrest and clutching his waistband?

(b) If so, may the government rely on Hamilton's reaction, even though it was precipitated by the officers' false claim of having an arrest warrant?

2. The district court may not intrude on the jury's factfinding role or vouch for witnesses. At Hamilton's trial, the district court instructed the jury that the police officers who testified that they found a gun on Hamilton, obtained that evidence legally and acted without improper motives. Did this instruction undermine Hamilton's defense that officers planted the gun during his arrest, or vouch for the officers, or both?

3. The Sentencing Guidelines direct increasing a defendant's offense level if the defendant possessed a firearm in connection with another felony, such as marijuana distribution. The district court applied this increase, even though the jury acquitted Hamilton of this conduct, and the only evidence specific to Hamilton showed that he possessed marijuana for personal consumption. Was this error?

## STATEMENT OF THE CASE

## I.   Officers chased and arrested Hamilton after claiming to have a warrant for his arrest.

On February 27, 2021, around 4:10 p.m., Hamilton, a 26-year-old Black man, was out on the sidewalk near Market and Jones Streets in San Francisco. 1-ER-125, 1-ER-129 n.5, 2-ER-377. Over the next twenty minutes, San Francisco Police Department (SFPD) officers observed Hamilton at

3

various times. *See* 1-ER-125, 2-ER-377, 3-ER-471–473. Not one officer claimed that Hamilton was dealing drugs or doing anything suspicious. 3-ER-539–540; *see* 2-ER-376–387, 4-ER-713.

Suddenly, around 4:30 p.m., a swarm of uniformed officers in multiple police cars converged on Hamilton. 1-ER-125–126, 2-ER-377. One officer told him: "Hey, come here, I need to talk to you." Ex. A 1:03–1:08.[1] As Hamilton turned toward that officer, another officer yelled: "Robbie Hamilton, there is a warrant for your arrest!" Ex. B 1:04–1:11. Hearing that, Hamilton turned and ran. Ex. A 1:03–1:10; 2-ER-385, 1-ER-125–126.

Several officers, including a plainclothes sergeant on a bicycle, gave chase. 2-ER-377. One of the chasers, Officer Joseph Navalle, tripped Hamilton as he rounded a corner. 2-ER-378; Ex. A 1:14–1:16. Hamilton fell, but quickly got up and kept running, though his pants were now falling off his waist. 2-ER-378, 2-ER-477–478, 2-ER-514; *see* Ex. B 1:53–2:36. About two blocks later, a police car blocked Hamilton's path and several officers tackled him. Ex. B 1:07–1:50; 2-ER-378. Hamilton landed face down on top

---

[1] Hamilton has separately moved this Court to transmit the following physical exhibits:

Exhibit A is Officer Michelle Avila's bodycam video from the arrest;
Exhibit B is Officer Andrew Juarez's bodycam video from the arrest;
Exhibit C is an excerpt from Officer Antone Haley's bodycam video of the arrest;
Exhibit D is surveillance-camera footage from near Hyde and Turk Streets in San Francisco, taken around 2:00 a.m. on February 14, 2021.

of the plainclothes sergeant's bicycle, and five officers jumped on his back to tie up his feet and cuff his hands. 2-ER-485; Ex. B 1:46–2:35.

## II. Hamilton was arrested because an officer suspected he was involved in a shooting weeks earlier.

As it turned out, there was no warrant for Hamilton's arrest. 1-ER-126 n.3. Instead, the order to take him into custody came from a single SFPD officer, Sergeant Hamdy Habib, who suspected Hamilton's involvement in a shooting about two weeks earlier. 2-ER-327.

That shooting occurred on February 14, 2021, around 2:00 a.m., near the intersection of Hyde and Turk Streets. 1-ER-121–122. Three people suffered gunshot wounds, and Habib was assigned to investigate. 1-ER-122, 2-ER-327. None of the victims knew who had shot them. *See* 1-ER-122–123. Two of the victims had very little information for investigators, but the third was more helpful. *See id.* He reported seeing a "small Black man" approach an older Black woman near the shooting site. 1-ER-122. The Black man was about 5'6" in height, around 33 years old, and had no facial hair. 1-ER-123, 1-ER-129 n.5. This man started arguing with the woman, but the victim, who spoke only Spanish, understood nearly nothing about their argument. 1-ER-122. The man then led the woman to his four-door vehicle, and about a minute later, the victim heard five gunshots and realized he had been hit. *Id.* The victim reported that he remembered the man's "face and would recognize him again." 1-ER-123.

5

During the investigation, Habib obtained surveillance video from near the shooting site. *Id.*; *see* Ex. D. Although that video did "not show discernible faces," it provided more information about what had occurred. 1-ER-123. It showed that a woman arrived at Hyde and Turk in a taxicab, then crossed the street while the cab waited. *Id.* Less than a minute later, a man parked a four-door Hyundai sedan directly behind the cab and went in the same direction as the woman. *Id.* About a minute after that, the man and woman returned, got in the Hyundai, and started to drive off. *Id.* As the Hyundai passed the intersection, a gun appeared to fire from it. *Id.*

The surveillance video captured the taxicab's car number. *Id.* After contacting the cab company, Habib learned that the cab picked up a woman named Stephanie around the time of the shooting, and the address where she was picked up. 1-ER-124. In researching that address, Habib determined that Stephanie lived there with her son, Hamilton. *Id.* That appeared to be the first time that Habib came across Hamilton's name. *See* 2-ER-365–371. Habib's review of Hamilton's criminal history indicated that Hamilton was on supervision and had been involved in a gun offense a decade earlier, when he was a juvenile. *See* 2-ER-327.

The surveillance video also captured the Hyundai's license plate number. 1-ER-123. Habib's investigation revealed that this car was rented by someone named Matalina Walker on February 8, 2021. *Id.*; 2-ER-368, 2-ER-391. The Hyundai was equipped with a dashboard camera, which recorded a 20-second video from the day it was rented. 1-ER-123–124. This

6

video depicted a young woman driving the Hyundai, Hamilton sitting in
the front passenger seat, and an unknown Black man sitting in the rear
passenger seat. *Id.* After that, the camera was turned off. 1-ER-124. The
Hyundai's GPS logged that it was around Hyde and Turk near the time of
the shooting. 1-ER-123.

Habib's investigation did not prompt him to seek a warrant for
Hamilton's arrest. *See* 1-ER-124, 1-ER-128. At this early stage, there were
defects and undone tasks in that investigation. For example, Habib
mistakenly believed that the Hyundai's dashcam showed Hamilton
driving, whereas it actually showed him in the passenger seat. *See* 1-ER-124
n.2. And Habib had not conducted an identification procedure with the
helpful victim, despite having Hamilton's photo and the victim's assurance
that he would recognize the suspected shooter. 1-ER-129. Although Habib's
log recorded that he suspected Hamilton in the shooting, he continued
investigating. 1-ER-128.

But on February 27, when another SFPD officer told Habib that he had
seen Hamilton near Market and Jones, Habib ordered Hamilton arrested. 2-
ER-327. Executing this order fell to Sergeant Daniel Solorzano, who
bicycled over to Hamilton's location and surveilled him. *Id.*; 1-ER-125.
Solorzano, who was told that Hamilton may still have the weapon used in
the shooting, then met with several officers and devised a plan to take him
into custody. 1-ER-125. Once the plan was ready, Solorzano bicycled back
to Hamilton's location and awaited the arresting officers. *Id.*; 2-ER-377.

### III. Hamilton was charged with possessing a gun discovered during his arrest and lost his motion alleging the arrest was illegal.

The federal charges eventually brought against Hamilton had nothing to do with the February 14 shooting. *See* 2-ER-350–352. Rather, the police officers claimed to have found a gun underneath Hamilton when they arrested him on February 27. 1-ER-126. The officers' bodycam videos showed them separating Hamilton from the police bicycle and then yelling, "Gun, gun, gun!" *See* Ex. B 2:37–3:10; Ex. C 0:40–0:51. In the videos, a gun is visible on the ground near Hamilton's right side. Ex. C 0:40–0:51; *see* 3-ER-486. The officers photographed and removed the gun, which contained seven rounds of ammunition. 1-ER-126, 3-ER-492. While searching Hamilton and his possessions, the officers also found some marijuana, $6,692 in cash, and two digital scales. 1-ER-126, 2-ER-386.

Hamilton's federal charges were based on the gun and marijuana found on February 27. 2-ER-350–352. He was first indicted under 18 U.S.C. § 922(g)(1) for possessing a firearm and ammunition as a felon. 2-ER-400–402. After Hamilton filed a suppression motion alleging an unconstitutional arrest, the government superseded the indictment to allege that the firearm was connected to a drug-trafficking crime—a charge under 18 U.S.C. § 924(c)(1)(A)(i) that carries a five-year mandatory-minimum sentence. 2-ER-350–352; *see* 2-ER-410–411.

In ruling on Hamilton's suppression motion, the district court held that the officers lacked probable cause to arrest him for the February 14

shooting when they first approached him and claimed to have a warrant. 2-ER-127–130. But the court also found that Hamilton's reaction to the officers created sufficient probable cause to arrest him for the shooting, and the court therefore denied Hamilton's motion. 2-ER-130–132. The case proceeded to trial. *See* 2-ER-412–417.

## IV. Hamilton was tried for being a felon in possession of a firearm and for possessing the firearm in furtherance of marijuana distribution.

To prove that Hamilton had a gun on February 27, the government relied on the testimonies and bodycam videos of officers involved in his arrest. *See* 3-ER-459–527. Navalle testified that after he tripped Hamilton, he observed him continue to run and start clutching at his waistband, until Navalle caught up with him and brought him to the ground. 3-ER-464–465. To Navalle, the clutching indicated that Hamilton might have a gun, because the waistband is where "subjects or people hide weapons usually[.]" 3-ER-465. Officer Antone Haley then testified that after Hamilton was on the ground, "we beg[a]n to reposition him" by "lift[ing] up his legs," and then "we observed that there was a firearm underneath his -- kind of his right hip area." 3-ER-486. Haley "opin[ed]" that the firearm came "from Mr. Hamilton's person." 3-ER-510. The government also showed the jury Haley's bodycam video of Hamilton's arrest, which depicted the officers' discovery of the gun. 3-ER-495; *see* Ex. C.

Hamilton's main defense to the section 922(g) charge was that the government failed to prove beyond a reasonable doubt that the gun came from him rather than being planted by one or more of the arresting officers. 1-ER-41; *see* 4-ER-865–873. Hamilton pointed out that the officers' bodycam videos showed neither the gun on him, nor how it ended up near him after the officers slid him off their bicycle. 4-ER-870–871. And he stressed the findings of the government's criminalist, who testified that Hamilton's DNA was not found on the gun. 4-ER-871–873. The criminalist explained that the samples taken from the gun's slide, grip, trigger, and cartridges could not be analyzed, while the sample from the gun's magazine excluded Hamilton as a contributor. 4-ER-635–643, 4-ER-652. The magazine sample contained DNA from four persons, and the likelihood that Hamilton was not one of them was 22.9 times higher than the likelihood that he was. 4-ER-650. Moreover, the criminalist revealed that one of those DNA contributors was identified as a different person known to SFPD. 4-ER-652–655, 4-ER-657. The criminalist also failed to test the magazine sample for DNA from the many officers involved in Hamilton's arrest. 4-ER-648; *see* 4-ER-872–873.

To prove that Hamilton was guilty of the section 924(c) charge, the government attempted to show that he was dealing marijuana. *See* 4-ER-850–862. It called an agent from the Drug Enforcement Administration to testify as an expert on the habits and methods of drug traffickers. 4-ER-660–725. This person testified that the amount of marijuana Hamilton

10

possessed (which he reported as 330 grams gross weight); the money Hamilton had in various denominations; and the scales, indicated that Hamilton was dealings drugs. 4-ER-681–682, 4-ER-686. The expert also testified that drug dealers commonly carry guns to protect their drugs and cash. 4-ER-669–670.

Hamilton's defense to the section 924(c) charge was that the marijuana was for his personal use. 4-ER-875–884. His expert on cannabis consumption and quality explained that most of the marijuana Hamilton had was shake, which is leafy material that has almost no commercial value and is normally used for baking. 4-ER-732–737. The expert explained that marijuana generally is sold in preset amounts, like an ounce or an eighth of an ounce, while Hamilton had random amounts in three bags, and no smaller baggies to subdivide it. 4-ER-743–744; *see* 4-ER-674, 4-ER-702, 4-ER-710, 4-ER-881. The expert also observed that only one of Hamilton's scales worked, and opined that the marijuana Hamilton had was consistent with personal use. 4-ER-741–742, 4-ER-745

Hamilton's brother testified that Hamilton relied on marijuana to relieve severe bouts of neck pain. 4-ER-780–783. He explained that Hamilton frequently baked with shake, first converting it to butter, and then using the butter to make marijuana brownies, cupcakes, or granola bars. 4-ER-769–771, 4-ER-773. Hamilton typically used about 100 grams of shake for a single batch of brownies, and he and his brother smoked about 35 grams of marijuana in a single session. 4-ER-769–772; *see also* 4-ER-739.

11

Hamilton's brother also testified that Hamilton used a scale to measure out the marijuana for baking and smoking. 4-ER-767–768, 4-ER-772. And Hamilton's brother explained why Hamilton kept all his money on his person: Hamilton did not have a bank account. 4-ER-785. When he received a paycheck from his job at the Department of Public Works, he cashed it and carried the cash in his pockets. 4-ER-785–786.

## V. The district court instructed Hamilton's jury about the conduct and motives of the officers who arrested him.

During Hamilton's trial, as well as before and after it, one point of contention between the parties was a jury instruction about the conduct and motives of the officers who participated in the February 27 arrest. *See generally* 1-ER-33–37. The government proposed the following instruction in its motions *in limine* and the parties' proposed jury instructions:

> The evidence in this case was obtained legally. It is not for you to consider or to speculate whether any evidence presented to you was obtained improperly or in violation of law.
> You also may not speculate as to whether the police had any improper motives in arresting or searching the defendant on February 27, 2021.

2-ER-268, *see* 2-ER-316–317. In the *in limine* motions, the government also sought to admit evidence about the February 14 shooting, 2-ER-301–303, and asked for an offer of proof before Hamilton could make "any argument that the arresting officers engaged in misconduct during Hamilton's

apprehension by, for example, planting the firearm or marijuana that underlie this case on his person at the time of his arrest," 2-ER-312.

Hamilton opposed these three motions. *See* 2-ER-212–216, 2-ER-225, 2-ER-227 & n.9, 2-ER-269. He explained that the government's proposed instruction "would act to lend an official imprimatur and implied judicial stamp of approval to every action the officers took during the arrest." 2-ER-269. Instead, he proposed the following language.

> Whether or not the arrest and search of the defendant was lawful is a legal matter that has been resolved by the Court and that is not within the scope of your role as jurors. It is not for you to consider or to speculate whether any evidence presented to you was obtained improperly or in violation of law.

*Id.* Hamilton explained that his version "would sufficiently address any concerns that the jury might consider whether the arrest and search was legal in this matter," while the "government's proposed instruction goes further than addressing that narrow concern[.]" *Id.*

Hamilton also argued that any evidence about the February 14 shooting was inadmissible. 2-ER-212–216. To the extent referring to that shooting explained why the officers arrested Hamilton on February 27, he argued that the same goal would be achieved by his version of the disputed instruction and by officer testimony that Hamilton was approached about an unrelated investigation. 2-ER-213 & n.3. As to the government's request for an offer of proof before Hamilton could argue that the gun was planted,

13

Hamilton explained that the government was not entitled to preview his defense. 2-ER-225.

The district court sided with the government on the language of the instruction about the officers' conduct and motives. *See* 1-ER-90–91, 1-ER-79, 1-ER-83. The court explained: "I would give the Government's proposed Instruction . . . and I would do that at the outset of the case or whenever the Government wanted." 1-ER-90–91; *see* 2-ER-268. As to the evidence related to the February 14 shooting, the court held that it was inadmissible. 1-ER-79. The court acknowledged that its "only potential relevance is to explain why the police wanted to talk with Mr. Hamilton on February 27," but explained that this concern would be addressed by the government's instruction and by permitting the arresting officers to testify that they approached Hamilton about an unrelated investigation. 1-ER-79, *see* 1-ER-35. Finally, the court held that Hamilton could put on a planting defense without telling the court "or anybody else" about "what's coming." 1-ER-101.

At trial, the court read the government's proposed instruction about the arresting officers' conduct and motives to the jury immediately after the parties delivered their openings. 1-ER-74–75. It read the instruction a second time in the middle of trial, in response to the government's argument that Hamilton had opened the door to evidence about the February 14 shooting. 1-ER-78. (The court also ruled that he had not. 1-ER-77.) The court then included the instruction in its proposed final jury

14

instructions. 2-ER-180. In response, Hamilton renewed his objection to the instruction "for the record" and repeated his alternative proposal. 1-ER-71. The court again overruled Hamilton's objection, explaining that it "had looked at that at the outset of the case and decided to instruct the jury with the government's instruction"; had already "instructed them a couple of times with the government's instruction[]"; and "will just stick with that." *Id.* The court then read the instruction a third time in its final charge to the jury. 1-ER-50–51.

## VI. The jury convicted Hamilton only of possessing a firearm as a felon, and the court denied Hamilton's motion for a new trial.

After deliberating for three hours, the jury submitted the following questions to the court:

> 1)     On count one, is it correct to say we the jury must have a unanimous decision and can only vote on count two if count one is decided?
> 2)     If we have an idea that there's no way to be unanimous do we continue trying or make decision now on verdict[?]

2-ER-174–175, 4-ER-897. The court instructed the jury to continue deliberating. 4-ER-897–901. On the second day of deliberations, the jury acquitted Hamilton of the section 924(c) charge, but convicted him of count one, which was the felon-in-possession charge. 2-ER-172, 4-ER-903–906.

Hamilton reprised his objection to the jury instruction in a motion for a new trial, arguing that the instruction may have influenced the jury to reject his defense that officers planted the gun. *See* 1-ER-37. The district

15

court denied the motion on the merits, but also found that Hamilton had waived his challenge to the instruction. 1-ER-33–46.

## VII. The court enhanced Hamilton's sentence for possessing a firearm in connection with marijuana distribution.

Although the jury acquitted Hamilton of possessing a firearm in furtherance of marijuana sales, the government asked the district court to increase Hamilton's sentence based on that acquitted conduct. 2-ER-150–151. The Probation Office did not recommend applying the enhancement. *See* 2-ER-150 n.1.

At sentencing, the district court recognized that Hamilton has used marijuana "a lot all the time" since he was 13 years old. 1-ER-21. The court acknowledged that Hamilton suffers from ongoing pain and Post-Traumatic Stress Disorder—the result of a "random [AK-47] gun-shot wound to the back of his neck," 2-ER-136, when he was just 11 years old. *See* 1-ER-20; *see also* 2-ER-134–135, 2-ER-142. As the court knew, the physical effects of that incident remained with Hamilton, because the bullet could not "be removed due to its position near a critical organ structure[.]" 2-ER-136. Hamilton's brother had testified that Hamilton relied on marijuana to manage his condition. 4-ER-780–783. Hamilton not only smoked marijuana, but also baked with the plant, which required larger quantities. 4-ER-769–772. But despite this specific evidence about Hamilton's heavy marijuana usage, the district court relied on the

government expert's generic testimony about drug dealers to conclude that Hamilton was selling marijuana and that the gun was connected to those sales. 1-ER-12–14. The district court therefore imposed a four-level enhancement under USSG § 2K2.1(b)(6)(B). 1-ER-14.

## SUMMARY OF ARGUMENT

Hamilton's appeal raises three issues:

First, the evidence obtained from his February 27 arrest should have been suppressed because that arrest was illegal. As the district court held, an investigation into the February 14 shooting did not provide probable cause of Hamilton's involvement. Hamilton's reaction to the officers' false claim of having an arrest warrant—which was to run away while grabbing his pants—did not supply the missing probable cause. Hamilton fleeing was not particularly inculpatory in light of this Court's recognition that young Black men might flee from the police for their safety. And his clutching at his waistband was readily explained by his sagging pants. Further, Hamilton's reaction hardly bore on who committed the shooting. But even if his reaction supplied probable cause, the arrest was still unlawful because it was executed in an unreasonable manner. Officers cannot develop probable cause by lying about having an arrest warrant.

Second, the district court erred when it instructed Hamilton's jury that the officers who claimed to have found a gun during his arrest obtained that evidence "legally" and had no "improper motives." Because

17

Hamilton's central defense to the felon-in-possession charge was that those officers planted the gun, this instruction intruded on the jury's factfinding role. The instruction also vouched for the two testifying officers who were involved in Hamilton's search and arrest. The instructional error was not harmless, because Hamilton presented evidence and arguments that the gun did not come from him, and the jury struggled with the issue. Hamilton preserved his objection to this instruction at the *in limine* stage, during trial, and in a motion for a new trial. And he certainly did not waive his objection to an instruction that undermined his defense. Even if plain-error review applies, however, the instruction requires reversal.

Third, the district court erred by enhancing Hamilton's sentence for having a gun in connection with marijuana distribution. The jury acquitted Hamilton of that conduct because the evidence showed that he intended to consume the marijuana, not sell it. Further, any possible connection between the marijuana and the gun was attenuated by California's legalization of marijuana and its ubiquity in San Francisco.

## STANDARDS OF REVIEW

When reviewing a district court's denial of a motion to suppress, this Court reviews legal conclusions de novo and factual finding for clear error. *United States v. I.E.V.*, 705 F.3d 430, 434 (9th Cir. 2012).

Whether a jury instruction violated due process is reviewed de novo. *United States v. Mikhel*, 889 F.3d 1003, 1056 (9th Cir. 2018).

18

For sentencing decisions, this Court "review[s] the district court's factual findings for clear error, its construction of the United States Sentencing Guidelines de novo, and its application of the Guidelines to the facts for abuse of discretion." *United States v. Harris*, 999 F.3d 1233, 1235 (9th Cir. 2021).

## ARGUMENT

### I.   The government failed to show that Hamilton's warrantless arrest was constitutional.

The district court's order denying Hamilton's suppression motion proceeded in three steps. First, the court held that officers lacked probable cause to arrest Hamilton for the February 14 shooting when they approached him on February 27. 1-ER-121, 1-ER-127–130. Second, it held that officers "had a good faith basis to question Hamilton" about that shooting, and found "[t]hat is what the officers tried to do[.]" 1-ER-129–130. Third, it held that Hamilton's actions after the officers approached him, when combined with the officers' preexisting reasonable suspicion, sufficed for probable cause to arrest him for the shooting. 1-ER-131–132.

The court's analysis was correct at step one, but not at steps two or three. The court erred at step three, because there was not probable cause to arrest Hamilton before the officers claimed to have found a gun on him. His actions after the officers approached him were at most ambiguous and had no bearing on who committed a shooting nearly two weeks earlier.

19

The court also erred at step two, because the officers announced that they approached Hamilton to arrest him, not merely to question him. Even if Hamilton's attempt to avoid that unlawful arrest engendered probable cause, the way that the officers approached him rendered the subsequent arrest unreasonable. For these related reasons, the district court's denial of suppression must be reversed.

A.  The government did not carry its burden of establishing probable cause that Hamilton committed a crime.

The government has the burden of proving that a warrantless arrest was supported by probable cause. *United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994). Probable cause requires more than a "strong reason to suspect" a person of a crime; it exists only "when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (cleaned up). Moreover, the Supreme Court has long expressed a preference for the use of arrest warrants whenever possible. *See Beck v. State of Ohio*, 379 U.S. 89, 96 (1964) ("An arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure on an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of

20

hindsight judgment."). That is why in some cases, an arrest "under a warrant may be sustainable where without one it would fall." *United States v. Ventresca*, 380 U.S. 102, 106 (1965).

As the district court correctly found, the information that the officers had about the February 14 shooting amounted to, at most, reasonable suspicion for a temporary investigative detention under *Terry v. Ohio*, 392 U.S. 1, 22 (1968); not probable cause for a full-blown arrest. 1-ER-129. The officers had reason to believe that Hamilton's mother was at the scene of the shooting, though that hardly meant Hamilton was there too. 1-ER-128. Then there was a connection, albeit a tenuous one, between Hamilton and the Hyundai: one time, a week before the shooting, Hamilton and two others had been in that car, which was rented and driven by someone else. 1-ER-123–124, 1-ER-128. And Hamilton had a criminal history. 1-ER-132. But no evidence placed Hamilton at the scene of the shooting on February 14. 1-ER-128–129. And because Hamilton was 26 rather than 33 years old, and had facial hair, he did not match the only description of the shooter, which was far too general anyway. 1-ER-129 & n.5. Moreover, Habib's investigation was incomplete, and had not even resulted in an application for an arrest warrant. 1-ER-128. The district court correctly concluded that the "investigation by itself did not provide probable cause to arrest Hamilton." *Id.*

The court then erred in holding that Hamilton's reaction to the officers' announcement that they had an arrest warrant created probable cause to

arrest him for the shooting. 1-ER-132. The court identified two factors from Hamilton's reaction to support its holding. One was that Hamilton fled when an officer falsely announced that there was a warrant for his arrest. 1-ER-132. The other was that two officers saw him reach for his waistband while running, which they believed "could be a sign that he had a gun." *Id.* These ambiguous factors, which had no nexus to the February 14 shooting, are insufficient for probable cause that Hamilton committed that shooting.

The closest case on point is *Wong Sun v. United States*. 371 U.S. 471, 484 (1963). In that case, the Supreme Court held unconstitutional the arrest of a man whom the police suspected of dealing drugs, despite that man running from the officers and reaching for an unknown object. *See id.* at 474, 479–84. The officers suspected the man (named Toy) of selling heroin, because a different man (who was arrested with heroin on him) informed them that he had purchased it from Toy the previous night. *Id.* at 473. The officers learned that Toy owned a laundry business on Leavenworth Street and headed there to ring the bell. *Id.* at 473–74. When Toy opened the door, an officer asked him about laundry services. *Id.* at 474. Toy responded that the laundry was not yet open for business and advised him to return in two hours. *Id.* The officer "thereupon took his badge from his pocket and said, 'I am a federal narcotics agent.'" *Id.* At that, "Toy immediately slammed the door and started running down the hallway through the laundry[.]" *Id.* (internal quotation marks omitted). Several agents followed in pursuit. *Id.* As Toy "reached into a nightstand drawer," one of the agents "drew his

pistol, pulled Toy's hand out of the drawer, placed him under arrest and handcuffed him." *Id.*

The Supreme Court held this arrest unlawful. *Id.* at 484. At the outset, the Court observed that the officers "made no attempt to obtain a warrant for Toy's arrest." *Id.* at 481. Next, the Court held that the officers' investigation into Toy did not amount to probable cause. *Id.* at 481–82 & n.9. Finally, the Court rejected the government's contention "that any defects in [the investigation] . . . were remedied by events which occurred after [the officers] arrived." *Id.* at 482. Specifically, the Court held that "Toy's flight down the hall when the supposed customer at the door revealed that he was a narcotics agent" did not "adequately corroborate[] the suspicion generated by" the investigation. *Id.* Nor did Toy's "reach[ing] into a nightstand drawer" change matters. *Id.* at 474; *see id.* at 501 (Clark, J., dissenting). Toy's actions provided insufficient "inference of guilty knowledge," and a "contrary holding [] would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked." *Id.* at 482, 484 (majority opinion).

Same here. As the district court found: "The ten days that passed between Habib's initial suspicion of Hamilton's involvement in the shooting (February 17) and Hamilton's arrest (February 27) was plenty of time to seek an arrest warrant; indeed, on February 27, the officers could have obtained a warrant instead of 'devis[ing] a plan' to take Hamilton into

23

custody." 1-ER-128. But SFPD officers made no attempt to seek a warrant. *Compare Wong Sun*, 371 U.S. at 481, *with* 1-ER-128. Just like in *Wong Sun*, the SFPD officers' investigation failed to produce probable cause for Hamilton's arrest. *Compare* 371 U.S. at 482, *with* 1-ER-128. And finally, also like in *Wong Sun*, Hamilton fleeing from the officers could not convey "guilty knowledge" about the February 14 shooting, because the officers never accused him of committing that shooting when trying to arrest him. *Compare* 371 U.S. at 482, *with* Ex. B 1:04–1:11.

Unmoored from that shooting, reading into Hamilton's flight is "problematic," because "some citizens may flee from police for their safety." *United States v. Brown*, 925 F.3d 1150, 1156 (9th Cir. 2019). This Court has recognized that "the burden of aggressive and intrusive police action [] falls disproportionately on African-American . . . males," and "uneven policing may reasonably affect the reaction of certain individuals—including those who are innocent—to law enforcement." *Id.* at 1156 (internal quotation marks omitted). Hamilton's flight must be viewed in the context of the harrowing experiences of many young Black men who have met their deaths at the hands of the police—including George Floyd, who was murdered by police just nine months before Hamilton's arrest. *See Jamison v. McClendon*, 476 F. Supp. 3d 386, 390 nn.1–13, 15, 17 (S.D. Miss. 2020) (chronicling experiences of Black men shot by police); *see also* Rick Rojas & Neelam Bohra, *What We Know About Tyre Nichols's Lethal Encounter With Memphis Police*, New York Times (Jan. 30,

24

2023) https://www.nytimes.com/article/tyre-nichols-memphis-police-dead.html. In that context, Hamilton's attempt to avoid the officers, like Toy's "flight from the door," must be "regarded as ambiguous conduct." *Wong Sun*, 371 U.S. at 482; *accord Commonwealth v. Banks*, 658 A.2d 752, 753 (Pa. 1995) ("[T]he fact of flight, under the circumstances presented, did not constitute a sufficient additional factor to give rise to probable cause.").

That is even more so about Hamilton's alleged "clutching at his front waistband area." 2-ER-377; *see* 2-ER-379. None of the officers claimed to have seen a gun or any sort of bulge on Hamilton. *See* 3-ER-476, 3-ER-510–511, 3-ER-539–540, 2-ER-376–387. And they observed him clutching at his waistband only *after* he had been tripped and gotten back up, when his pants were falling off his waist. *See* 2-ER-378; Ex. B 1:53–2:36. This "clutching" was at most ambiguous conduct, and far less incriminating than Toy reaching into his nightstand drawer while fleeing from federal narcotics officers. *See Wong Sun*, 371 U.S. at 474; *see id.* at 501 (Clark, J., dissenting). Hamilton's clutching, which was "provoked" by the officers tripping him during their illegal arrest attempt, cannot "transform[]" the officers' suspicion "into probable cause for arrest." *Wong Sun*, 371 U.S. at 484.

Moreover, Hamilton's conduct had no nexus to the crime for which the district court found probable cause. *See United States v. Licavoli*, 604 F.2d 613, 620 (9th Cir. 1979) ("The Government must show that it has probable cause to believe that a *specific* crime has been or is being committed[.]"

(emphasis added)). Hamilton running away and allegedly clutching at his waistband on February 27 contributed nearly nothing to the probable-cause determination about his involvement in the February 14 shooting. Whatever new reasonable suspicion Hamilton's conduct might have generated on February 27, it does not combine with the officers' suspicion about the February 14 shooting to create probable cause to arrest Hamilton for that shooting.

B. <u>The arrest was executed in an unreasonable manner.</u>

Even if the officers developed probable cause for Hamilton's arrest based on his reaction to their unlawful attempt to arrest him, they developed that probable cause in an unreasonable manner. *See United States v. Alverez-Tejeda*, 491 F.3d 1013, 1016 (9th Cir. 2007) ("An otherwise lawful seizure can violate the Fourth Amendment if it is executed in an unreasonable manner."). The district court saw no problem with the arrest, because it found that the officers were merely trying to question Hamilton when they approached him on February 27, 2021. 1-ER-130. But that factual finding is contrary to the record. *See United States v. Bontemps*, 977 F.3d 909, 917 (9th Cir. 2020) (clear error when district court's factual finding is without support in the record).

The officers' declarations, reports, and their conduct at the scene, showed that they attempted to arrest Hamilton, not just to question him. Habib declared that he "told Sgt. Solorzano that Hamilton was wanted for

the February 14 shooting, and directed him to *arrest* Hamilton based on my investigation." 2-ER-327 (emphasis added). Solorzano's police report stated that several officers "devised a plan to take Hamilton into custody," and that under Solorzano's "direction, multiple uniformed officers responded to the area in numerous marked police vehicles to put our plan into action." 2-ER-377. Navalle reported that the officers "approached Hamilton to effect an arrest." 2-ER-378. Navalle's partner confirmed that "[a]n arrest plan was made for Hamilton," and that the officers "approached Hamilton to effect an arrest." 2-ER-376. Indeed, at least eight uniformed officers in three marked police cars (and plainclothes Solorzano on a bicycle) assembled to execute the arrest. *See* Ex. A 1:07, 1:13, 1:53. And Hamilton knew that the officers were trying to arrest him, because one of the officers (falsely) announced: "Robbie Hamilton, there is a warrant for your arrest!" Ex. B 1:04–1:11. The district court's factual finding that what the officers "tried to do on February 27" was "question Hamilton to investigate further," simply got the facts wrong. 1-ER-129–130.

Because the officers had neither probable cause nor a warrant when they tried to arrest Hamilton, and falsely claimed to have a warrant, their actions forced him to choose between submitting to an unlawful arrest and trying to avoid it. His attempt to flee was likely lawful, because the officers never had the right to arrest him in the first place. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 472 (9th Cir. 2007) ("If the officers could not lawfully arrest a person[,] . . . the officers could also not lawfully arrest the person

for resisting arrest." (internal quotation marks and brackets omitted)). Yet the district court held that Hamilton's response was precisely what gave the officers the probable cause that they initially lacked. *See* 1-ER-130–132. Relying on his response in these circumstances violated the Fourth Amendment.

The officers' actions were akin to a police-created exigency. In *Kentucky v. King*, the Supreme Court indicated that police officers may not "create [an] exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." 563 U.S. 452, 462 (2011). Here, the officers threatened precisely that by announcing to Hamilton that they had a warrant for his arrest when they did not even have probable cause. *See* 1-ER-125–126 & n.3, 1-ER-129. Just as exigent circumstances are unlikely to justify a warrantless entry into a dwelling "where the police, without a warrant or any legally sound basis for a warrantless entry, threaten that they will enter without permission unless admitted," so Hamilton's arrest cannot be justified by his response to the officers' threat to arrest him without a warrant or other legal justification. *Id.* at n.4.

Also analogous are three Ninth Circuit cases that prohibit police officers from abusing their positions to mislead suspects. First, in *United States v. Phillips*, this Court held that officers who lacked probable cause to believe that a suspect was inside a building may not gain entry by falsely claiming that they were investigating a burglary. 497 F.2d 1131, 1136 (9th Cir. 1974). Although such tactics are generally lawful, this Court held that they may

28

not be used to circumvent a lack of probable cause. *See id.* at 1134–35. Similarly, although officers may generally chase a person who flees from them, *see California v. Hodari D.*, 499 U.S. 621, 629 (1991), they may not circumvent an initial lack of probable cause by manufacturing a chase with a false claim about having an arrest warrant.

Second is *United States v. Bosse*, where an officer gathered the information necessary for probable cause in an untruthful manner. *See* 898 F.2d 113, 115 (9th Cir. 1990) (per curiam). There, a federal officer accompanied a state agent to the suspect's home for an inspection related to the suspect's application for a state license. *Id.* at 114. The suspect invited both the state agent and federal officer into his home, though the federal officer did not "identify himself." *Id.* The federal officer proceeded to investigate "possible federal firearms violations" for a later warrant application. *Id.* at 115. This Court held that the officer's observations could not contribute to probable cause for that warrant application, because the federal agent obtained them though misrepresentation. *Id.* By the same token, the officers who arrested Hamilton could not use his fleeing and clutching toward probable cause, because these observations were the result of the officers falsely claiming to have a warrant for his arrest.

Third is *United States v. Stefan Ramirez*. 976 F.3d 946, 955 (9th Cir. 2020). In *Stefan Ramirez*, federal agents had a warrant to search a suspect's home and any cars parked there, but could not detain the suspect or search his car unless both were at home. *Id.* at 949. To bring the suspect and his car

29

home, the agents called him at work and told him that there had been a burglary. *Id.* at 950. This Court held that the agents' actions violated the Fourth Amendment because it "was only by posing as police officers investigating a fictitious home burglary that the agents convinced [the suspect] to drive home, thereby creating the authority to seize him and his car that did not otherwise exist at the time." *Id.* at 956. In the same way, it was only by telling Hamilton that there was a warrant for his arrest that the police officers in this case created the authority to arrest him. The violation here was even more egregious because the officers' actions manufactured probable cause that did not previously exist, while the officers in *Stefan Ramirez* merely brought the suspect and his car "within the ambit" of a preexisting warrant. 976 F.3d at 955.

   *Stefan Ramirez* built on *Phillips* and *Bosse* to set forward a rule that prohibits the government from abusing the public's trust in law enforcement. *See* 976 F.3d at 953 ("Deception is unlawful when the government makes its identity as law enforcement known to the target of the ruse and exploits the target's trust and cooperation to conduct searches or seizures beyond that which is authorized by the warrant or other legal authority, such as probable cause."). The officers' conduct in this case violated that rule. Permitting their conduct would allow police officers to approach suspects and falsely claim to have a warrant for their arrest, and then arrest them only if they flee. Just like the tactics banned in *Stefan Ramirez*, *Phillips*, and *Bosse*, this conduct would undermine the public's

ability "to rely on the representations of government officials." *Id.* at 954 (cleaned up).

Whether viewed as a threat to violate the Fourth Amendment, *see King*, 563 U.S. at 462 n.4, or a falsehood that traded on their position of trust, *see Stefan Ramirez*, 976 F.3d at 956, the officers' claim to have a warrant was an unreasonable way of developing probable cause. As Hamilton argued in his initial suppression motion, his arrest was illegal because the officers lacked probable cause when they accosted him with that false claim. *See* 2-ER-390, 2-ER-395–398.

## II. The district court erred by instructing the jury about the police officers' conduct and motives.

At Hamilton's trial, the district court erred by thrice giving the following instruction:

> The evidence in this case was obtained legally. It is not for you to consider or to speculate whether any evidence presented to you was obtained improperly or in violation of law.
> You also may not speculate as to whether the police had any improper motives in arresting or searching the defendant on February 27, 2021.

2-ER-268; *see* 1-ER-50–51, 1-ER-74–75, 1-ER-78; *see also* 3-ER-458–459, 3-ER-526, 4-ER-827–828.

This instruction essentially directed the jury to find that the gun was not planted. At the very least, it vouched for the police officers who testified against Hamilton. This error was not harmless, forfeited, or

waived. Even if Hamilton had failed to preserve an objection to this instruction, it was plain error for the district court to give it.

A. The instruction intruded on the jury's factfinding role.

Under the Fifth and Sixth Amendments to the United States Constitution, a criminal conviction must "rest upon a *jury determination* that the defendant is guilty of every element of the crime with which he is charged[.]" *United States v. Gaudin*, 515 U.S. 506, 510 (1995) (emphasis added). The district court cannot intrude on the jury's factfinding role. *See United States v. Irons*, 31 F.4th 702, 714 (9th Cir. 2022) (granting new trial when "instruction effectively removed from the jury's consideration the only disputed issue"); *United States v. Lindberg*, 39 F.4th 151, 159 (4th Cir. 2022) (same when district court "impermissibly took an element of the crime out of the hands of the jury"). An instruction that "prevent[s] the jury from crediting [the defendant's] argument," *Mikhel*, 889 F.3d at 1057, is an "improper[] intru[sion] on the fact finding process," *id.* at 1058 (cleaned up).

In this case, Hamilton's central defense to the felon-in-possession charge was that the government planted a firearm on him during his arrest. 1-ER-41; *see* 4-ER-865–873. The district court's instruction prevented the jury from crediting his defense in two ways. First, the statement that the "evidence in this case was obtained legally" undermined Hamilton's defense, because the evidence included the gun. *See* 3-ER-491–492. The gun

32

could not be described as "obtained legally" if it came from SFPD officers. Second, by planting the gun, the police would have been acting with "improper motives in arresting or searching the defendant on February 27, 2021." By instructing the jury against that conclusion, the district court again undercut Hamilton's defense. Together, these statements improperly intruded on the jury's factfinding process. *See Mikhel*, 889 F.3d at 1058.

In denying Hamilton's motion for a new trial, the district court did not address how the language of the instruction could be interpreted by jurors. *See* 1-ER-40–44. Nonetheless, the court upheld the instruction for four reasons: (1) the court did not intend the instruction to discredit Hamilton's defense; (2) the instruction was necessary to avoid juror confusion; (3) the court's other instructions "made clear that it was the government's burden to prove that Hamilton knowingly possessed the firearm"; and (4) Hamilton had the opportunity to argue that the gun was planted. *See id.* These reasons are unpersuasive.

First, the district court's intent cannot rescue the instruction. What matters is how a juror could have understood the instruction, not how the district court "understood" it. 1-ER-40. Even if the instruction was susceptible to multiple interpretations, Hamilton's conviction cannot stand when one of those interpretations impermissibly hampered his defense. As the Supreme Court explained in *Sandstrom v. Montana*, "the fact that a reasonable juror could have given [an instruction an unconstitutional interpretation] means that we cannot discount the possibility that [the

33

defendant]'s jurors actually did proceed upon [an unconstitutional] interpretation[]." 442 U.S. 510, 519 (1979). In that circumstance, "the instruction cannot be adjudged valid." *Id.*

Second, the instruction was not necessary to remove "suppression" from the jury's consideration or to "foreclose[] the possibility that the jury speculate why police approached Hamilton on February 27." 1-ER-43–44. The district court never addressed why Hamilton's proposed alternative instruction, along with government witnesses telling the jury that the officers approached Hamilton regarding an unrelated investigation, would have been insufficient to achieve those objectives. *See* 1-ER-43–44. The court's explanations for giving this instruction over Hamilton's objection cannot justify its prejudicial effect on his defense.

Third, the district court's other instructions did not affect the meaning of the instruction about the officers' conduct and motives. There is no dispute that the district court correctly instructed the jury about the elements of the crime, the burden of proof, and the definition of "knowingly possessed." 1-ER-41. The problem was that the offending instruction counseled the jury that the firearm was not planted by the police, which helped the government carry its burden of proof by negating Hamilton's defense. *See United States v. Michael Ramirez*, 714 F.3d 1134, 1139 (9th Cir. 2013) ("A judge may not preclude the jury from drawing any inferences that it may legitimately draw.").

34

Fourth, Hamilton having an opportunity to argue that the gun was planted did not cure the problem with the instruction. *See Murtishaw v. Woodford*, 255 F.3d 926, 969 (9th Cir. 2001) ("[C]ounsel's arguments alone cannot salvage a legally erroneous instruction."). The district judge in *Lindberg* made this point bluntly when (in the context of a dispute about the meaning of the term "official act") he told the defendant's lawyer: "[I]t's not going to do you any good to get up there and argue this was not an official act when I'm going to tell the jury during the charge it is an official act." 39 F.4th at 163 n.10. Here, too, Hamilton's argument that the gun was planted did him no good, because the judge essentially told the jury that it was not.

B. <u>The instruction vouched for the police officers who arrested Hamilton.</u>

The instruction also violated Hamilton's trial rights because it amounted to judicial vouching on behalf of the police officers who testified against him. "Vouching," which usually implicates statements by prosecutors, "consists of placing the prestige of the government behind a witness through [1] personal assurances of the witness's veracity, or [2] suggesting that information not presented to the jury supports the witness's testimony." *United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005) (internal quotation marks omitted). This practice undermines the functioning of our factfinding system, which "vests the sole determination

regarding [witness] credibility (like all other factual determinations) with the jury." *Id.* at 1148. Vouching is especially "egregious" when it "invoke[s] the court as the guarantor" of a witness's "veracity" and thereby "place[s] the imprimatur of the judicial system itself" on that witness's testimony. *United States v. Smith*, 962 F.2d 923, 935, 936 (9th Cir. 1992).

Here, the court vouched for testifying SFPD officers Navalle and Haley by instructing the jury against ascribing "improper motives" to them. *See* 1-ER-78. This implicated both vouching concerns by (1) positioning the district court as a guarantor of the officers' motives, and (2) suggesting the existence of undisclosed information that allowed the court to make its guarantee. The court's statement that the "evidence in this case was obtained legally" compounded the vouching problems, because it conveyed the district court's approval of the officers' conduct when arresting and searching Hamilton. *See id.* As a result, the jury was more likely to credit Navalle and Haley's version of events and reject Hamilton's contrary explanation. *See Weatherspoon*, 410 F.3d at 1151 ("[T]he possibility of prejudicial effect stemming from vouching is increased in cases where credibility is of particular importance." (internal citation omitted)).

In holding otherwise, the district court pointed to its general instruction about witness credibility, which tracked this Court's form instruction on the issue. *See* 1-ER-42; *compare* 1-ER-53–55, *with* 9th Cir. Model Crim. Jury Instr. 6.9, https://www.ce9.uscourts.gov/jury-instructions/node/888 (last modified Dec. 2017). But reading an instruction that applies in every trial

could not negate the court's specific vouching for Navalle and Haley's testimonies about Hamilton's search and arrest. In *Smith*, for example, this Court did not even consider whether the district court gave a general instruction about credibility when evaluating a vouching error. *See generally* 962 F.2d at 925–36. The district court's instruction here about the officers' conduct and motivations stamped "the imprimatur of the judicial system" on their testimonies, which a generic instruction about witness credibility could not erase. *See id.* at 936.

C. The government cannot show that the instruction was harmless beyond a reasonable doubt.

Because Hamilton's DNA was not on the gun and the officers' bodycam videos did not show the gun on him, the officers' testimonies—and their credibility—were crucial to the government's case. *See* 4-ER-870–873. But the district court also held that even if its instruction undermined Hamilton's planting defense, the error was harmless. 1-ER-44–46. Such an error is not harmless unless the government proves "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Thongsy*, 577 F.3d 1036, 1043 (9th Cir. 2009) (internal quotation marks omitted). The government cannot come close to meeting that standard.

Echoing one of its reasons for finding the instruction was correct, the court asserted that it was harmless because it "did not prevent Hamilton

from arguing . . . that police planted [the gun]." 1-ER-44. The court elaborated that through his "cross-examination and closing argument, Hamilton had ample opportunity to sow seeds of doubt—and did so." *Id.* Specifically, the court referenced Navalle'a testimony that he did not see a gun as he chased Hamilton; that no gun fell from Hamilton when he was tripped and then kept running; and that Navalle first saw a gun only after Hamilton's arrest. *Id.*; *see* 3-ER-472–477. Indeed, as the court found, "none of the officers involved in apprehending Hamilton indicated in their reports that they saw him with a gun before his arrest." 1-ER-44. Also, the criminalist who analyzed the DNA from the gun testified that Hamilton's DNA was not found on the gun and that another person's DNA was found on the magazine. *See* 1-ER-45; 4-ER-635–643, 4-ER-648–657. In his closing, Hamilton drew the jury's attention to the criminalist's failure to compare the DNA from the magazine against the many officers involved in the arrest. 4-ER-872–873.

The district court's finding that Hamilton's evidence and arguments rendered its error harmless was exactly backwards. That Hamilton gave the jury reasons to doubt where the gun came from only proved that the instruction caused harm. *See Weatherspoon*, 410 F.3d at 1151 ("[A]s the [government's] case becomes progressively weaker, the possibility of prejudicial effect grows correspondingly."). Without the district court telling the jurors that the officers obtained the gun legally and had no ulterior motives when they executed their plan to arrest Hamilton, one or

38

more of the jurors may well have credited Hamilton's defense and voted to acquit him. *See United States v. Hall*, 552 F.2d 273, 275 (9th Cir. 1977) ("Where the evidence raises a factual issue, an instruction dictating the result invades the ultimate fact-finding role of the jury."). Even under the much tougher plain-error standard, this Court recently reversed a jury verdict for an instructional error that "effectively removed [the defendant's argument] from the jury's consideration." *See Irons*, 31 F.4th at 714.

Here, in addition, the jury indicated that at least some of its members were skeptical about Hamilton's guilt. After three hours of deliberating, the jury submitted a note suggesting that it was deadlocked on the felon-in-possession count. *See* 2-ER-174–175, 4-ER-897. Such indications that an error concerned a close question cut against harmlessness. *See Aguilar v. Woodford,* 725 F.3d 970, 984 (9th Cir. 2013) (citing jury notes in finding that error was prejudicial); *Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (finding trial errors were prejudicial when "the jury actually struggled with th[e relevant] question"); *Rose v. Lane*, 910 F.2d 400, 403 (7th Cir. 1990) (holding that "question" from jury "contributes to our finding that the instructions were not harmless"). And the likelihood that the instruction caused harm was increased by the court drawing attention to it through multiple repetitions. *See United States v. Lampkin*, 159 F.3d 607, 612 (D.C. Cir. 1998) (error not harmless when "trial judge gave the erroneous instruction three times"). Considering Hamilton's evidence and arguments, and the jury's indication that it was initially deadlocked on the relevant

39

count, the government cannot prove beyond a reasonable doubt that the erroneous instruction, delivered three times, had no effect on the verdict.

D. <u>Hamilton preserved his objection to the instruction.</u>

To preserve an objection to a jury instruction, a defendant must "inform the court of the specific objection and the grounds for the objection[.]" Fed. R. Crim. P. 30(d). An objection that is "specific enough to bring into focus the precise nature of the alleged error" is sufficient to avoid forfeiture. *United States v. Pineda-Doval*, 614 F.3d 1019, 1026 (9th Cir. 2010) (cleaned up). Generally, an objection is preserved "when a party takes a position and the district court rules on it[.]" *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 543 (9th Cir. 2016).

When the defendant fails to make a timely assertion of a right, any objection is forfeited and therefore reviewed under the tougher plain-error standard. *See* Fed. R. Crim. P. 30(d), 52(b); *see also United States v. Olano*, 507 U.S. 725, 733 (1993). An objection is waived and unreviewable only when the defendant "has both invited the error, and relinquished a known right." *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc).

**1. Hamilton did not forfeit the error.**

Hamilton preserved his challenge to the instruction about the officers' conduct and motives by objecting on three occasions. He first objected in his opposition to the government's motions *in limine*, and he explained his objection and offered an alternative instruction in the parties' joint

40

proposed instructions filed that same day. *See* 2-ER-227 & n.9, 2-ER-269. He reprised his objection at the final-instructions conference. 1-ER-71; *see also* 4-ER-625. And he raised the issue a third time in his motion for a new trial. *See* 1-ER-33. The district court denied Hamilton's objection when he first raised it, 1-ER-90–91, 1-ER-79, 1-ER-83, denied it again before giving its final instructions, 1-ER-71, and denied it a third time when ruling on Hamilton's new-trial motion, 1-ER-40–44. Because Hamilton "t[ook] a position" on the instruction and "the district court rule[d] on it," the error was preserved. *Yamada*, 825 F.3d at 543.

Hamilton's objection at the *in limine* stage specifically identified the error with the instruction. *See Pineda-Doval*, 614 F.3d at 1026. He argued that the government's proposed "language would act to lend an official imprimatur and implied judicial stamp of approval to every action the officers took during the arrest." 2-ER-269. This argument conveyed Hamilton's concern that the instruction could influence the jury to conclude that police officers did nothing wrong during his arrest. He also articulated his vouching concern in the exact words that this Court has used to describe the issue. *See Smith*, 962 F.2d at 936 (explaining that "vouching" placed "the *imprimatur* of the *judicial* system itself on [a witness's] credibility" (emphasis added)). And he elaborated on those concerns in his motion for a new trial, where he explained how the instruction undermined his planting defense. *Cf. Smith v. Arthur Andersen LLP*, 421 F.3d 989, 999 (9th Cir. 2005) (allowing litigant to "bolster[]"

41

position with new supporting arguments).[2] Even if Hamilton's initial objection "could have been clearer, it was sufficient to preserve" the instructional error. *Pineda-Doval*, 614 F.3d at 1026.

In any event, Hamilton clarified any ambiguity about his objection in his motion for a new trial. *See* 1-ER-37. On this issue, *Shorter v. Baca* is instructive. *See* 895 F.3d 1176, 1182–83 (9th Cir. 2018). The plaintiff in that case objected to an instruction at trial, "albeit on a different ground," and then articulated the relevant ground "in a motion for a new trial." *Id.* at 1183. This Court held that the plaintiff's objections were sufficient to avoid plain-error review. *See id.* Notably, *Shorter* was a civil case, in which the "stakes are lower" and the forfeiture rules therefore more exacting. *See Hoard v. Hartman*, 904 F.3d 780, 787 (9th Cir. 2018) (internal quotation marks omitted). *A fortiori* in this criminal case, Hamilton's new-trial motion preserved the instructional error even if his pretrial objections to the same instruction were not precisely on the same ground.

---

[2] While Hamilton did not announce his planting defense at the *in limine* stage, he was "entitled to remain silent as to what defense he will present[.]" *See United States v. Hernandez-Meza*, 720 F.3d 760, 765 (9th Cir. 2013). The district court was aware that Hamilton's trial could implicate a planting defense because it denied the government's motion compelling Hamilton to disclose such a defense contemporaneously with its first ruling on the instruction about the officers' conduct and motives. *See* 1-ER-101; *see also* 2-ER-312. Indeed, the district court explicitly told Hamilton that he does not "have to tell [the court or anybody else] what's coming[.]" 1-ER-101.

### 2. Hamilton did not waive the error.

In ruling on Hamilton's new-trial motion, the district court held that Hamilton had waived his objection "by affirmatively approving the instruction before I read it a second time and in the final jury instructions as a whole." 1-ER-40. This holding was incorrect for three reasons: (1) the government never claimed that Hamilton waived the error; (2) Hamilton did not invite any error; and (3) there is no evidence that Hamilton accepted this instruction despite knowing that it hampered his defense.

First, the government's opposition to Hamilton's new-trial motion never claimed that Hamilton waived this error. *See* 2-ER-163 n.4. The district court therefore erred by raising the alleged waiver on its own. *Cf. United States v. Sainz*, 933 F.3d 1080, 1087 (9th Cir. 2019) ("[T]he district court abuses its discretion if it raises the defendant's [§ 3582(c)(2)] waiver *sua sponte*.").

Second, Hamilton did not invite the instructional error or affirmatively approve the government's language at either juncture identified by the district court. As the court acknowledged, Hamilton objected to the instruction pretrial, before the court first read it to the jury. 1-ER-34–35, 2-ER-269. At the second reading, the issue was not the instruction's language, but whether questioning by Hamilton opened the door to evidence about the February 14 shooting. *See* 3-ER-524–525. Hamilton's argument about keeping out that evidence did not endorse the instruction's language,

which had already been adjudicated by the district court. *See id.* At that stage, "any further objection [to the language] would have been superfluous and futile[.]" *See Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1189 (9th Cir. 2005). Even the district court seemed to recognize that objecting to the language was pointless after the jury had already heard the instruction. *See* 4-ER-625 ("I have instructed them a couple of times with the government's instructions, so I think I will just stick with that."). And far from approving that language "in the final jury instructions as a whole," 1-ER-40, Hamilton explicitly (if futilely) reprised his objection "for the record," 4-ER-625.

These facts are far afield from the waiver case cited by the district court—*United States v. Kaplan*, 836 F.3d 1199, 1216–17 (9th Cir. 2016). *See* 1-ER-38–40. There, the trial judge "specifically asked both parties" to "take a hard look" at a particular issue with an instruction, and the defendant not only failed to object but "affirmatively approved" the final result. *See* 836 F.3d at 1216–17. Hamilton, on the other hand, lodged two pre-verdict objections to this exact instruction. *See* 2-ER-269, 4-ER-625. Had Hamilton waived his challenge to the instruction, the district court would have said so when ruling on his second objection. Instead, the court explained that it was sticking with the government's language because it "had looked at that [issue] at the outset of the case and *decided* to instruct the jury with the *government's instruction*"—not because Hamilton invited or affirmatively accepted the government's instruction. 4-ER-625 (emphasis added).

44

Third, Hamilton did not relinquish a known right. More than just inviting error, waiver requires a finding that the defendant "considered the controlling law, or omitted element, and, in spite of being aware of the applicable law, proposed or accepted a flawed instruction." *See Perez*, 116 F.3d at 845. Even if Hamilton had accepted the government's instruction, there is no evidence that he knowingly agreed to the court undermining his defense or vouching for police-officer witnesses. *See* 1-ER-38–40.

E.  Even if Hamilton did not preserve his objection, the instruction was plainly erroneous.

Even under the plain-error standard, the instruction about the officers' conduct and motives requires a new trial. To prevail on plain-error review, Hamilton must show (1) an error; (2) that was plain; (3) and affected his substantial rights; (4) and also had a serious effect on the fairness, integrity, or public reputation of judicial proceedings. *Irons*, 31 F.4th at 711. As Hamilton explained *supra*, the instruction was erroneous because it undercut his planting defense and vouched for the testifying officers. *See United States v. Adair*, 38 F.4th 341, 355 (3d Cir. 2022) ("For purposes of th[e first] prong [of plain-error review], the difference between preserved and unpreserved error is immaterial[.]"). The error was plain, because this Court has explicitly prohibited district courts from "intrud[ing] on the fact finding process." *Mikhel*, 889 F.3d at 1058 (internal quotation marks omitted). It affected his substantial rights, because the "de facto removal"

of a contested, triable issue "from the jury's consideration undermines confidence in the outcome." *Irons*, 31 F.4th at 715. And the error satisfied the fourth prong, because "[r]emoving the key disputed issue at trial from the jury's consideration certainly casts doubt on the fairness of the proceedings[.]" *Id.* at 715. Preserved or not, the instructional error cannot stand.

### III. The district court erred in increasing Hamilton's sentence for possessing a firearm in connection with selling marijuana.

Although the jury found Hamilton not guilty of possessing the firearm in furtherance of a drug-trafficking crime (and the Probation Office did not recommend applying a sentencing enhancement), the district court nonetheless increased his sentence based on that acquitted conduct. 1-ER-14, 2-ER-173; *see* 2-ER-150 n.1. At sentencing, the district court applied a four-level enhancement for using or possessing "any firearm or ammunition in connection with another felony offense[.]" USSG § 2K2.1(b)(6)(B). The district court found that Hamilton "was dealing [marijuana] in the Tenderloin" and that "the gun was necessary, and part of the -- the work that Mr. Hamilton was doing that day." 1-ER-12, 1-ER-14. The court erred because there was no evidence that Hamilton possessed marijuana with intent to sell it or that the gun was connected with the marijuana.

A. <u>Hamilton was not selling marijuana.</u>

The district court found that Hamilton was selling marijuana, because he "had a huge amount of [it]"; "two scales," and about "$6,500 in cash." 1-ER-12. But the only evidence particularized to Hamilton showed that he intended to consume the marijuana he possessed.

First, as the district court recognized, Hamilton regularly consumed large quantities of marijuana. 1-ER-21, 1-ER-26. He self-medicated with the plant to treat Post-Traumatic Stress Disorder and ongoing pain—the result of an AK-47 bullet lodged in his neck since he was 11 years old. 1-ER-20; *see* 2-ER-134–136, 2-ER-142. Because he has habitually used marijuana since he was 13 years old, he has developed a high tolerance for it; he needed large amounts to attain its therapeutic effects. 1-ER-21, 1-ER-26; *see* 4-ER-697, 4-ER-876. He not only smoked but also frequently baked with marijuana, which requires even larger amounts than smoking. 4-ER-769–772; *see* 4-ER-739.

Here, the quantity and quality of the marijuana Hamilton possessed showed that it was for his personal use. While the government frequently inflated the marijuana quantity by referring to its gross weight (which included three bags), the actual amount Hamilton had was about 285 grams. *See* 4-ER-874–875, 4-ER-887; *see also* 4-ER-675–676, 4-ER-686, 4-ER-714–715, 4-ER-725. Two of the bags contained only shake, which is used for making edibles and has almost no commercial value; the third bag

47

contained one-third shake. 4-ER-732–737, 4-ER-682. As Hamilton's brother testified, Hamilton baked with shake, using about 100 grams for a single batch of brownies. 4-ER-772–773; *see* 4-ER-739. And when Hamilton smoked marijuana with his brother, they went through about 35 grams at a time. 4-ER-769. Hamilton's shake therefore would have yielded just two batches of brownies, leaving him with enough marijuana for a few smoking sessions. *See* 4-ER-875–878.

Second, the scales did not suggest that Hamilton was dealing marijuana. Only one of the two scales actually worked, and Hamilton needed it to measure out the right quantities for baking and smoking. *See* 4-ER-741–742, 4-ER-767–768, 4-ER-772. Also, although marijuana is typically sold in specific amounts, like an ounce or an eighth of an ounce, Hamilton's bags did not contain typical commercial amounts. 4-ER-743, 4-ER-674, 4-ER-702, 4-ER-743–744. And Hamilton did not have baggies for smaller amounts. *See* 4-ER-710, 4-ER-881; *see also* 2-ER-382–384 (cataloguing items found on Hamilton upon arrest). If he wanted to use the working scale to make a sale, he would have needed to crumble the loose marijuana into his hypothetical customer's hands. *See* 4-ER-881.

Third, Hamilton's money also was unconnected to the marijuana. The government's expert on the "habits and methods of drug traffickers" testified that a person holding a large amount of cash in various denominations indicates drug dealing, because the large amount is consistent with earnings at "the close of business," while having several

48

denominations is useful for making change. 4-ER-666, 4-ER-681–682; *see* 4-ER-681 (Government's expert: "This is . . . your earnings for the day. You don't start off your day with $6,000 in your pocket."). But Hamilton already had that cash when he was arrested at the very beginning of the night, making nonsense of the government's theory that he intended to sell the marijuana. *See* 2-ER-377. As for the denominations, if Hamilton regularly made change for others, his cash would have been sorted and organized, not wadded up in his pockets. *See* Ex. A at 4:14–6:51; *see* 4-ER-880–881. The only evidence particularized to Hamilton provided a far more logical explanation for that cash: Because Hamilton did not have a bank account, he kept his money (including cashed paychecks) on his person. 4-ER-785–786.

Finally, and most telling of all, the officers who surveilled Hamilton the day of his arrest observed that he was *not* dealing drugs. Solorzano observed Hamilton twice that day: before devising the plan for his arrest, and while waiting for the other officers to execute that plan. 2-ER-377. At no point did Solorzano, or any other officer who observed Hamilton, report seeing him involved in anything resembling drug dealing. *Id.*; *see* 3-ER-539, 4-ER-713. At bottom, the court's conclusion that Hamilton was dealing marijuana on February 27 was based only on generalities and speculation by the government's expert, and was contrary to the evidence actually linked to Hamilton. This finding cannot stand, because "in imposing enhancements under the Guidelines, [courts] cannot be swayed by

49

speculation or convinced by conjecture." *United States v. Grimaldo*, 993 F.3d 1077, 1082 (9th Cir. 2021).

B. <u>The gun was unrelated to any hypothetical marijuana sale.</u>

Even if the court did not err in finding that Hamilton intended to sell the marijuana, there was no evidence that Hamilton possessed the gun "in connection with" that hypothetical sale. USSG § 2K2.1(b)(6)(B). As the government acknowledged in its sentencing memorandum, this enhancement requires a finding that the firearm "facilitated" or "embolden[ed]" a person to sell drugs. *See* 2-ER-151; *see also United States v. Gonzales*, 506 F.3d 940, 947 (9th Cir. 2007) (requiring that firearm "facilitated or potentially facilitated — i.e., had some potential emboldening role in — a defendant's felonious conduct" (internal quotation marks omitted)); USSG § 2K2.1(b)(6)(B), n.14(A) (requiring that "firearm or ammunition facilitated, or had the potential of facilitating, another felony offense").

To the extent that application note 14(B) to this Guideline purports to define "in connection with" differently for drug-trafficking offenses, that definition is contrary to the Guideline's plain language and is unreasonable. *See United States v. Kirilyuk*, 29 F.4th 1128, 1138 (9th Cir. 2022) ("[T]he role of the Application Notes is to explain the Guidelines, not enact policy changes to them."); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (deferring to agency interpretation of its own regulation only when the

"regulation is genuinely ambiguous" and the interpretation is "reasonable"). In any event, this Court need not address this application note's contrary definition because the government failed to raise it below and the district court did not rely on it. *See* 2-ER-150–151, 1-ER-12–14; *see also United States v. Baldon*, 956 F.3d 1115, 1123 (9th Cir. 2020) ("Generally, we do not entertain arguments on appeal that were not presented or developed before the district court." (internal quotation marks omitted)); *United States v. DeRusse*, 859 F.3d 1232, 1236 n.1 (10th Cir. 2017) (declining to consider sentencing argument government failed to raise below).

To find a connection between the gun and the marijuana, the district court relied on the government expert's testimony that people involved in drug trafficking commonly have a weapon to protect their drugs and cash. 1-ER-14. But the expert could cite no statistics to support that assertion, especially as it related to marijuana. *See* 4-ER-705. And the expert's testimony ignored that marijuana is legal in California. *See* 3-ER-668–670, 3-ER-673, 3-ER-686–687. As a local judge observed, "[a]nyone who regularly strolls the streets of San Francisco would be surprised not to encounter the smell of marijuana with the same frequency (probably greater) as the smell of cigarettes." *United States v. Villagomez*, 554 F. Supp. 3d 1019, 1023 (N.D. Cal. 2021) (Chhabria, J.). Even if the expert's testimony made some sense for illicit drugs generally, it is unpersuasive for a plant that is at least as ubiquitous in San Francisco as cigarettes and can be legally purchased at a store. *See People v. Hall*, 271 Cal. Rptr. 3d 793, 802 (Cal. Ct. App. 2020)

(noting that in San Francisco marijuana may be purchased at a dispensary). The district court erred when rejecting the jury's conclusion that the gun was not connected to the marijuana.

## CONCLUSION

This Court should reverse Hamilton's felon-in-possession conviction for two separate reasons: (1) the evidence discovered during Hamilton's February 27 arrest should have been suppressed, and (2) the district court erred during Hamilton's trial by instructing the jury about the arresting officers' conduct and motives. Alternatively, this Court should remand for resentencing because the district court erroneously increased Hamilton's sentencing range for possessing a firearm in connection with another felony.

Respectfully submitted,

JODI LINKER
Federal Public Defender

February 1, 2023

*s/ Yevgeniy Parkman*

Yevgeniy Parkman
Assistant Federal Public Defender

52

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-10161

I am the attorney or self-represented party.

**This brief contains** | 12,616 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [              ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Yevgeniy Parkman | **Date** | 02/01/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**       *Rev. 12/01/22*